UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | |
| SHULYN X. ZHANG, ) | Case No. 15-48026-659 |
| ) | Chief Judge Kathy A. Surratt-States |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| FREDRICH J. CRUSE, Chapter 7 Trustee, ) | **Adversary No. 15-4234-659** |
| ) | |
| ) | **PUBLISHED** |
| Plaintiff, ) | |
| ) | |
| -v- ) | |
| ) | |
| JACOB BURCH, and ) | |
| STEPHANIE BURCH, ) | |
| ) | |
| Defendants. ) | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The matter before the Court is Trustee's Complaint to Determine the Validity of Lien, Answer, Affirmative Defense, and Counterclaim Filed By The Burches, Trustee's Answer and Defenses to Counterclaim, Joint Exhibit List, Joint Witness List, Joint Stipulations of Fact for Use at Trial, Memorandum Filed by Jacob Burch and Stephanie Burch and Plaintiff's Trial Brief. A trial was held on March 8, 2016, at which the parties appeared by counsel and presented witnesses and oral argument. The matter was taken under submission. Upon consideration of the record as a whole, the Court makes the following **FINDINGS OF FACT**:

Debtor, Shulyn X. Zhang (hereinafter "Debtor") filed a Voluntary Petition for relief under Chapter 7 of the U.S. Bankruptcy Code on October 23, 2015 (hereinafter "Petition Date"). Trustee Fredrich J. Cruse (hereinafter "Trustee") is the duly appointed Chapter 7 Trustee in Debtor's case. Defendants, Jacob and Stephanie Burch (hereinafter "the Burches"), husband and wife, are residents of the State of Indiana. *See* Joint Stipulation, ¶ 3. Trustee commenced this Adversary Proceeding by filing a Complaint on November 18, 2015. Trustee's Complaint seeks a

determination of the validity and extent of any lien claimed by the Burches because of the Indiana Circuit Court Order entered on or about September 10, 2013 (hereinafter "Indiana Circuit Court Order"). *See* Joint Stipulation, ¶¶ 4 and 37. On December 24, 2015, the Burches filed Answer, Affirmative Defenses, and Counterclaim. The Burches' Counterclaim seeks imposition of a constructive trust on Debtor's Ally Account 5313 at Ally Bank, because of false statements and misrepresentations made by Debtor in the sale of 615 Worth Court, Carmel, Indiana (hereinafter "Real Property"). *See* Joint Stipulation, ¶ 5. On January 14, 2016, the Trustee filed Answer and Defenses to Counterclaim. *See* Joint Stipulation, ¶ 6.

**I. Mold Infestation at the Real Property and Debtor's Purchase in 2008**

The Real Property was constructed in 2001 by J.F. Sears Construction Co., Inc. (hereinafter "J.F. Sears"). *See* Joint Stipulation, ¶ 7. On July 12, 2003, J.F. Sears conveyed the Real Property by corporate warranty deed to Joseph F. Sears and Tammy R. Sears, husband and wife (hereinafter "the Sears Family"), and New Century Mortgage Corporation recorded a mortgage on the Real Property. *See* Joint Stipulation, ¶ 8. In 2006, the Sears Family defaulted on the mortgage and abandoned the Real Property, and thereafter the mortgagee, New Century Mortgage Corporation, acquired the Real Property in a foreclosure proceeding. *See* Joint Stipulation, ¶ 9. On November 26, 2007, the mortgagee, New Century Mortgage Corporation, or its agent caused the Real Property to be listed for sale, using the Multiple Listing Service (hereinafter "MLS"). Wynkoop Brokerage Firm, LLC (hereinafter "Wynkoop") was the seller's agent. *See* Joint Stipulation, ¶ 10.

The MLS noted "MOLD DISCLOSURE MUST BE SIGNED BEFORE ENTERING THE PROPERTY" (emphasis original) under "Property Description". *See* Joint Stipulation, ¶ 11. Wynkoop required those entering the Real Property to read and sign a document entitled "MOLD DISCLOSURE AND RELEASE" that stated in pertinent part:

> WHEREAS, Seller and/or Broker/Agent have been informed that as a result of a water leak, mold and/or other microscopic organisms may exist at the Property, and such microscopic organisms and/or mold may cause physical

> injuries, including but not limited to allergic and/or respiratory reactions or other problem particularly in persons with immune system problems, young children and/or elderly persons; and
>
> WHEREAS, Releasor acknowledges that the Seller and Broker/Agent desire, and it is Seller's and Broker/Agent's intention, to disclose these matters to Releasor via this Release; and . . .
>
> Releasor hereby acknowledges that Releasor: (i) has read and fully understands the disclosures, terms and conditions as set forth in this Release; (ii) is aware of and understands the potentially hazardous condition of the property as set forth above; and (iii) notwithstanding the foregoing, still desires to enter the Property.

*See* Joint Stipulation, ¶ 12.

Debtor signed the "MOLD DISCLOSURE AND RELEASE" on or about December 7, 2007. Debtor was asked about this "MOLD DISCLOSURE AND RELEASE" during her deposition on January 29, 2014 in connection with the Indiana Litigation, and Debtor testified that "I mean, the disclosure just tell me there is mold." *See* Joint Stipulation, ¶ 13. Debtor submitted an offer to purchase the Real Property, and the seller submitted to Debtor for signature an addendum (hereinafter "Purchase Addendum"). The Purchase Addendum contains the following language:

> Buyer acknowledges and agrees that Seller has strongly encouraged Buyer to have the Property inspected and abated or remediated by a qualified mold remediation specialist to reduce the concentrations of mold or similar substances that might be present on or in the Property, prior to human or animal occupancy. Buyer hereby warrants and agrees that Buyer has had the opportunity to thoroughly inspect the Property, for the existence of mold, mildew or other fungal substances and has elected to purchase the Property, despite any mold contamination, relying solely upon Buyer's own inspection, examination and evaluation of the Property, and not on any information provided or to be provided by Seller.
>
> Buyer further acknowledges that Seller has strongly encouraged Buyer to consult with a physician regarding the potential adverse effects of mold exposure on human and animal health, particularly with respect to humans or animals whose health may be more likely to be adversely affected by mold due to their age, physical condition, allergies, medical condition, history or susceptibility.

*See* Joint Stipulation, ¶ 14.

Debtor signed and initialed each page of the Purchase Addendum. *See* Joint Stipulation,

¶ 15. On December 19, 2007, Debtor retained Cornerstone Inspection Company (hereinafter "Cornerstone") to perform an inspection of the Real Property. *See* Joint Stipulation, ¶ 16. The Cornerstone inspection report identified two "Major Concerns" for the Real Property. First, the Cornerstone report said, "The brick siding does not have visible weep holes installed around the bottom coarse to allow proper air circulation and condensation drainage." Second, the Cornerstone report said, "The drywall in the finished part of the basement was removed at the time of the inspection indicating a past flood and a biological growth was observed on the wood studs and wall throughout the basement area." *See* Joint Stipulation, ¶ 17. On January 8, 2008, Debtor purchased the Real Property, and Debtor moved into and occupied the Real Property shortly thereafter. *See* Joint Stipulation, ¶18.

After moving into the Real Property, Debtor had work performed on the Real Property to combat the mold infestation. For instance, Debtor installed an oxidation air cleaning system to the HVAC system. In a deposition taken in connection with the Indiana Litigation, Debtor testified as follows:

> Q: All right. I want to talk about the HVAC system. Why did you add an oxidation air cleaning system?
> A: Oh, just because they say I had the mold. I want to do cleanup and I want to have better air in the house.

*See* Joint Stipulation, ¶ 19.

In 2012, Debtor placed the Real Property up for sale. *See* Joint Stipulation, ¶ 20. On November 27, 2012, Debtor prepared and executed an Indiana Sellers Residential Real Estate Sales Disclosure Form (hereinafter "Sales Disclosure Form") as required by Indiana law. *See* Joint Stipulation, ¶ 21. The Sales Disclosure Form required Debtor to disclose hazardous conditions by answering the following question:

> Have there been or are there any hazardous conditions on the property, such as methane gas, lead paint, radon gas in house or well, radioactive material, landfill, mineshaft, expansive soil, toxic materials, mold, other biological contaminants, asbestos insulation, or PCBs?

*See* Joint Stipulation, ¶ 22.

In response to the question about hazardous conditions, Debtor untruthfully checked "No" and represented to the public and the Burches that there had not been any hazardous conditions on the Real Property, including no mold or other biological contaminants. *See* Joint Stipulation, ¶ 23. In Debtor's deposition taken in the Indiana Litigation on January 29, 2014, Debtor testified as follows:

> Q: I just want to make sure we've established this. In November of 2012 when you filled out the sales disclosure form, you were aware that the basement had past mold problems prior to when you bought the home?
> A: Right, yes.

*See* Joint Stipulation, ¶ 24.

**II. The Burches' 2013 Purchase of the Real Property**

In the spring of 2013 the Burches were in the market to buy a home in Hamilton County, Indiana. *See* Joint Stipulation, ¶ 25. The Burches were inexperienced home buyers. *See* Joint Stipulation, ¶ 26. At the time the Burches were in the market to buy a home, they had a young growing family that included three children, ages six (6), three (3) and one (1). *See* Joint Stipulation, ¶ 27. On May 29, 2013, unaware of the Real Property's mold infestation, the Burches submitted to Debtor their proposed Purchase Agreement for the Real Property. The Purchase Agreement incorporates the Sellers Disclosure Form that contained information that Debtor knew was false. *See* Joint Stipulation, ¶ 28. On June 2, 2013, the Burches and Debtor entered into an agreement for the Burches to purchase the Real Property from Debtor. The agreed upon purchase price was $320,000. *See* Joint Stipulation, ¶ 29. The Purchase Agreement provides for an award of court costs and reasonable attorney's fees to a prevailing party for disputes relating to the sale/purchase. *See* Joint Stipulation, ¶ 30. The Burches and Debtor closed on the sale of the Real Property on July 12, 2013, and the Burches and their children moved into the Real Property later the same day. *See* Joint Stipulation, ¶ 31.

### III. The Burches' Discovery of the Undisclosed Defects in the Real Property

Within only a few weeks after moving into the Real Property, the Burches discovered that there were problems with the Real Property, including past mold. *See* Joint Stipulation, ¶ 32. Thus, because of the undisclosed defects, the Burches were forced to move out of the Real Property on August 10, 2013 and have been living in alternative housing ever since.

### E. Indiana State Court Litigation

On September 9, 2013, the Burches filed litigation against Debtor and others in Hamilton County Circuit Court, State of Indiana, Case No. 29C01-1309-CT-008502 (hereinafter "Indiana Litigation").  *See* Joint Stipulation, ¶ 35.

Contemporaneously with filing the Indiana Litigation the Burches filed an Emergency Motion for Prejudgment Attachment/Garnishment Order on Bank Accounts at Ally Bank Corp., and J.P. Morgan Chase Bank 053, Inc., and a Supplement to Emergency Motion for Prejudgment Attachment/Garnishment Order on Bank Account(s) of Defendant Shulyn X. Zhang (hereinafter collectively the "Motion for Attachment"). *See* Joint Stipulation, ¶ 36.

On or about September 10, 2013, Judge Paul Felix of the Hamilton County Circuit Court issued an order granting the Motion for Attachment and ordered ". . . that any and all funds up to but not exceeding $320,000 property or assets held on deposit by Ally Bank Corp, or J.P. Morgan Chase Bank 053, Inc. in the name of Shulyn X. Zhang and/or E-Pearl Art & Collectibles shall be held and a freeze put in place and that Defendant Shulyn X. Zhang shall be restricted and restrained from withdrawing or transferring any funds or assets held on deposit in her name or that of E-Peal Art & Collectibles, until further order of the Court . . ." (hereinafter the "Indiana Circuit Court Order"). *See* Joint Stipulation, ¶ 37.

A copy of the Indiana Circuit Court Order was delivered to Ally Bank. On September 12, 2013, Ally Bank acknowledged receipt of the Indiana Circuit Court Order in a letter to the Burches' counsel in the Indiana Litigation (hereinafter "Ally Bank Letter"). The Ally Bank Letter stated in

pertinent part:

> Please be advised Ally Bank complied with this Order and immediately froze the Interest Checking account in the name of Shulyn X. Zhang with a current balance of $713.50 and the Online Savings account in the name of Shulyn X. Zhang with a current balance of $215,178.50.

*See* Joint Stipulation, ¶ 38 and Burches Ex. 9.

The "Interest Checking Account" referred to in the Ally Bank Letter was Account No. XXXX5324 (hereinafter "Ally Account 5324") and the "Online Savings account referred to in the Ally Bank Letter was Account No. XXXX5313 (hereinafter "Ally Account 5313"). *See* Joint Stipulation,¶ 39.

While the Indiana Circuit Court Order was promptly delivered to Ally Bank, which acknowledged receipt of the Indiana Circuit Court Order and immediately froze the funds in Ally Accounts 5324 and 5313, the Indiana Circuit Court Order was not issued by the Clerk of the Circuit Court. The Indiana Circuit Court Order was not directed to the Sheriff. The Indiana Circuit Court Order did not require the Sheriff to seize and take into possession the property of Debtor. The Indiana Circuit Court Order was not delivered to the Sheriff. The distribution list on the Indiana Circuit Court Order does not list the Sheriff as a distributee. The Indiana Circuit Court Order was not served on Ally Bank by the Sheriff. *See* Joint Stipulation, ¶ 40. Thereafter, the Burches continued to prosecute the Indiana Litigation against Debtor and other defendants that were added to the case when the Burches filed an amended complaint. The defendants added in the amended complaint and a brief summary of the asserted basis for liability were as follows:

> (a) <u>Debtor.</u> The Burches alleged that Debtor caused their damages by fraud, deception and constructive fraud by failing to disclose the existence of prior and current mold in the Real Property;
>
> (b) <u>JF Sears.</u> JF Sears constructed and built the Real Property. The Burches alleged that JF Sears caused their damages by defectively constructing a house that allowed mold to occur and was uninhabitable;
>
> (c) <u>Easy Street Realty Inc. ("Easy Street").</u> Easy Street, was the real estate agent for Debtor in her original purchase of the Real Property in 2007/2008.

> The Burches alleged that Easy Street caused their damages by fraud, constructive fraud, breach of fiduciary duty and negligence by providing them with false information about the existence of mold;
>
> (d) <u>David Mohn ("Mohn").</u> Mohn was a real estate sales person who was employed by Easy Street as a real estate sales person and retained by Debtor to advise her and act as her agent in her original purchase of the Real Property. Mohn was also Debtor's real estate agent in the sale of the Real Property to the Burches. The Burches alleged that Mohn caused their damages by fraud, constructive fraud, breach of fiduciary duty and negligence by providing them with false information about the existence of mold;
>
> (e) <u>Carpenter Co., Inc. ("Carpenter").</u> Carpenter acted as the Burches' fiduciary and agent in their purchase of the Real Property in 2013. The Burches alleged that Carpenter caused their damages by breach of contract, breach of fiduciary duty, negligence and constructive fraud by failing to disclose the likely existence of prior and current mold in the Real Property;
>
> (f) <u>Susan Sommer ("Sommer").</u> Sommer was a real estate sales person who was employed by Carpenter as a real estate sales person and acted as the Burches' fiduciary and agent with regard to their purchase of the Real Property in 2013. The Burches alleged that Sommer caused their damages by breach of contract, breach of fiduciary duty, negligence and constructive fraud by failing to disclose the likely existence of prior and current mold in the Real Property; and
>
> (g) <u>SM Inspection Services LLC ("SM Inspections").</u> SM Inspections was a real estate inspection company retained by the Burches in 2013 to perform an inspection on the Real Property prior to the closing of the sale of the Real Property. SM Inspections prepared a Residential Inspection Report outlining its observations and conclusions in relation to its inspection of the Real Property. The Burches alleged that SM Inspections caused their damages by breach of contract and negligence by failing to find and report conditions on the property suggesting the presence of a significant mold condition and infestation at the Real Property.

See Joint Stipulation, ¶ 41.

JF Sears never answered the complaint because it went out of business before the Indiana Litigation was filed. The Burches settled with Easy Street/Mohn for a cash payment of $115,000. The Burches settlement with Carpenter/Sommer for a cash payment of $25,000. The Burches settled with SM Inspections for a cash payment of $6,000. The Burches and Debtor did not reach a settlement before Debtor filed her bankruptcy case. *See* Joint Stipulation, ¶ 42.

On September 8, 2015, the Indiana Court set the case for a one and a half day bench

trial on December 1-2, 2015, but Debtor filed her bankruptcy case on October 23, 2015, prior to the trial date. *See* Joint Stipulation, ¶ 43. The Burches filed a Motion for Relief from Stay in Debtor's bankruptcy case seeking relief from the stay (hereinafter "Lift Stay Motion") to permit the trial in the Indiana Litigation to proceed, but this Court denied the Lift Stay Motion without prejudice. *See* Joint Stipulation, ¶ 44. No judgment has been entered in the Indiana Litigation. *See* Joint Stipulation, ¶ 45.

## IV. The Burches' Damages

The Burches were damaged by Debtor's conduct in an amount in excess of $200,000 so that if the Court imposes a constructive trust on Ally Account 5313, the Burches are entitled to receive $200,000 from Ally Account 5313 and Trustee is entitled to receive the remaining balance in Ally Account 5313 and the total balance in Ally Account 5324. *See* Joint Stipulation, ¶ 46.

## V. Tracing of Net Sale Proceeds

Shortly before the closing on the sale of the Real Property, Debtor opened Ally Account 5313 with a $100 deposit. *See* Joint Stipulation, ¶ 48. At the closing, after payment of all expenses of the seller and of the mortgage on the Real Property, Debtor received a total of $254,624.90 (hereinafter "Net Cash Proceeds"). *See* Joint Stipulation, ¶ 49. Immediately following receipt of the Net Cash Proceeds, on July 12, 2013, Debtor caused the sum of $254,624.90 to be deposited into a bank account at JPMorgan Chase Bank, account XXXX8682 (hereinafter "Chase Bank Account"). Upon the deposit of the Net Cash Proceeds, the balance of the Chase Bank Account was $266,341.90. *See* Joint Stipulation, ¶ 50.

Between July 12, 2013 and July 18, 2013, the balance of the Chase Bank Account diminished by a total of $6,936.53, so that the balance in the Chase Bank Account on July 18, 2013 was $259,405.37. *See* Joint Stipulation, ¶ 51.

On July 18, 2013, Debtor caused the sum of $200,000 to be transferred from the Chase Bank Account to Ally Account 5313. On July 19, 2013, the sum of $200,000 was credited to Ally

Account 5313, resulting in a balance in Ally Account 5313 of $200,100. *See* Joint Stipulation, ¶ 52.

On August 29, 2013, Debtor deposited the sum of $9,950 into Ally Account 5313, and on September 9, 2013, Debtor made an e-check deposit of $9,289.53 into Ally Account 5313. *See* Joint Stipulation, ¶ 53. No amounts were ever withdrawn from Ally Account 5313 after it was established on June 22, 2013 through the Petition Date. *See* Joint Stipulation, ¶ 54. As a result of the foregoing, the sum of $200,000 can be traced from the Net Sale Proceeds into Ally Account 5313. *See* Joint Stipulation, ¶ 55. None of the Net Sale Proceeds can be traced into Ally Account 5324. *See* Joint Stipulation, ¶ 56.

**VI. Debtor's Other Creditors**

On October 23, 2015, Debtor filed her Schedule of Assets and Liabilities, which she thereafter amended on December 17, 2015 (hereinafter collectively "Schedules"). *See* Joint Stipulation, ¶ 57. Debtor listed one secured creditor and eleven unsecured creditors as of the Petition Date. The one secured creditor is oversecured. Nine of the eleven unsecured creditors are credit card companies that extended credit to Debtor or her sole proprietorship business, and their claims totaled $198,598.71. *See* Joint Stipulation, ¶ 58. Other than the Burches' claims, the claims of all of the other creditors listed in the Schedules arose after the funds in Ally Account 5313 were frozen in September of 2013. *See* Joint Stipulation, ¶ 59.

The Trustee argues that a pre-judgment attachment lien was not created, a constructive trust was not imposed before the petition date and a constructive trust should not be imposed in this bankruptcy case. The Burches argue that Indiana law recognizes a constructive trust in instances of fraud, that Debtor defrauded the Burches who can trace $200,000 of the purchase price of the Real Property, and thus a constructive trust should be imposed.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334 (2015) and Local Rule 81-9.01(b) of the United States District Court for the Eastern District of Missouri. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (A), (K), (O) (2015). Venue is proper in this District under 28 U.S.C. § 1409(a) (2015).

**CONCLUSIONS OF LAW**

The issue presented is whether the Court should impose a constructive trust on Debtor's Ally Bank Account 5313. At the outset, "[i]n bankruptcy cases, courts are reluctant to impose constructive trusts." *In re WEB2B Payment Sols.*, Inc., 815 F.3d 400, 408 (8th Cir. 2016). In the instant case, however, the parties rest the crux of their arguments on two cases at the center of conflict between constructive trusts and the Bankruptcy Code. The Burches rely on the Seventh Circuit case, *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 305 (7th Cir. 2014), where a constructive trust was imposed, but the Court acknowledged that constructive trusts "can subvert bankruptcy's distribution scheme if courts lose sight of the fact that it is an extraordinary equitable remedy, to be used sparingly." Trustee relies on the strict holding in the Sixth Circuit case *In re Omegas Group, Inc.*, 16 F.3d 1443 (6th Cir. 1994), which states that imposing a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code. Further, Trustee cites the Eighth Circuit case, *In re Jeter*, 171 B.R. 1017 (Bankr. W.D. Mo. 1994) aff'd, 178 B.R. 787 (W.D. Mo. 1995), aff'd, 73 F.3d 205 (8th Cir. 1996) (hereinafter respectively "*Jeter* 1, *Jeter* 2, and *Jeter* 3"), holding that a "constructive trust should not be imposed against the trustee in bankruptcy who represents all of the creditors" when a claimant is "similarly situated like every other creditor." Looking more closely at the *Jeter* 1 case, there the bankruptcy court held that plaintiff's claim for a constructive trust was merely a disguised effort to recover pre-petition fraudulent transfers for his sole benefit and that aside from the problems in meshing conflicting principles of constructive trust theory and Bankruptcy Code policies, plainitff failed to establish that outside bankruptcy court he

-11-

would be entitled to a constructive trust. *In re Jeter*, 171 B.R. 1017, 1025 (Bankr. W.D. Mo. 1994). Likewise, the *Jeter* 1 Court considered whether equity would be better served with or without a constructive trust and ultimately held that the facts presented in *Jeter* did not support a constructive trust. *Id* at 1023.

This Court acknowledges the holdings in the *Jeter* case trilogy; however, the Court finds that the Eighth Circuit has not placed a total ban on constructive trusts imposed post-petition and recognizes them in sufficiently extreme and egregious circumstances. In re Jeter, 171 B.R. 1015, 1020 (Bankr. W.D. Mo. 1994); *See also In re Morken*, 199 B.R. 940, 965 (Bankr.D.Minn. 1996) (The Eighth Circuit allows constructive trusts in very limited situations); *Chiu v. Wong*, 16 F.3d 306 (8th Cir. 1994) (The Eighth Circuit held that a constructive trust was appropriate because the trust was imposed on the debtor's property and did not diminish the estate to the detriment of other creditors). This Court now distinguishes the facts in *Jeter* 1 with the facts in the present case, yet still keeping in mind the narrow exception that the Eighth Circuit has carved out for the imposition of constructive trusts in sufficiently extreme and egregious circumstances.

Unlike the unsuccessful plaintiffs in *Jeter,* the Burches in the present case are not similarly situated, typical unsecured creditors, seeking to jump priority over other unsecured creditors on the basis of equity. The Burches–unsophisticated in the home-buying process–entered the market to buy their first home. The Burches unwittingly purchased the Real Property from Debtor on the reasonable basis that all information answered on the state required Sales Disclosure Form was truthful. To their demise, it was not. Debtor knowingly and unapologetically misrepresented that the Real Property was free of mold leaving the Burches with an uninhabitable home that must now be completely torn down. Unlike the plaintiffs *Jeter*, the Burches did not race to the court to file this litigation in anticipation of any other creditor who may also have a cause of action. The Burches were not driven by the thought of mountainous litigation, but the earnest desire to bring peace to their lives after being left completely homeless due to the misconduct of Debtor.

Furthermore, the *Jeter* 1 Court also considered whether a constructive trust could be established under Missouri law and if the general equities of the case including whether the plaintiff was able to protect himself from fraud of the debtor. In its analysis below this Court will establish that a constructive trust can be imposed under governing Indiana law and that the general equities are overwhelmingly in favor of the Burches. In this case, Debtor's fraud is so egregious and deceptive that the principles of equity outweigh prejudice to other creditors. Considering the case as a whole, the Court finds that the Eighth Circuit carved the narrow exception to allow the imposition of a constructive trust for sufficiently extreme and egregious cases such as this; therefore, the Court finds that a constructive trust must now be imposed.

It is well settled that "[s]tate law initially governs the resolution of property rights within a bankruptcy proceeding." *In re MJK Clearing, Inc.*, 371 F.3d 397, 401 (8th Cir. 2004)(citing *Chiu v. Wong*, 16 F.3d 306, 309 (8th Cir. 1994)). Here, the Real Property and, the Indiana Litigation are in Indiana, and the Burches reside in the State of Indiana; thus, Indiana law shall govern the rights regarding Debtor's Ally Bank Account 5313.

The State of Indiana recognizes that "[a] constructive trust is a creature of equity, devised to do justice by making equitable remedies available against one who, through fraud or other wrongful means, acquires property of another." *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 280 (Ind. App. 2005) (citations omitted). The Indiana Supreme Court has stated:

> A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may rise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.

*Id.* (citing *Melloh v. Gladis*, 261 Ind. 647, 656, 309 N.E.2d 433, 438-39 (1974)(citing 5 SCOTT ON TRUSTS § 404.2)).

-13-

Further, Indiana real estate statutes require that the Indiana Real Estate Commission develop a disclosure form for use in residential transactions. *See* Ind. Code Section 32-21-5-7 (2016). Pursuant to Indiana law, the Sales Disclosure Form must be completed, signed and submitted to the prospective residential buyer before an offer for sale is accepted. *See* Ind. Code 32-21-5-10 (2016).

The Indiana Supreme Court described the required real estate disclosures by stating:

> The General Assembly has simply relived the buyer of needing to initiate a specific inquiry in order to get honest disclosure about significant features of a purchase and, by the same token, it has forced the seller's affirmative duty to initiate disclosure–and therefore full and honest disclosure–about those same features. In effect, the General Assembly has codified a portion of the normal home-buying back-and-forth between buyers and sellers, and in doing so streamlined the process with the aim of starting every such transaction on the same footing.

*Johnson v. Wysocki*, 990 N.E.2d 456, 465 (2013).

The elements of a fraud claim under the Indiana real estate disclosure statues are (i) a false representation of past or existing facts on the real estate disclosure form, (ii) made with actual knowledge of its falsity, (iii) which proximately caused the complaining party injury. *Wysocki v. Johnson*, 18 N.E.3d 600, 604 (Ind. 2014).

Once a constructive trust has been established, the party claiming to be a beneficiary under the trust must identify the trust funds and trace the trust property. *See* Collier on Bankruptcy, ¶ 5451.28[4]. Tracing is governed by federal law. *Id.* The Eighth Circuit has adopted the "lowest intermediate balance test" for tracing. Under this test "a court follows the trust fund to and decrees 'restitution from an account where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund.'" *In re MJK Clearing, Inc.*, 371 F.3d 397, 402 (8th Cir. 2004).

In the present case, the parties have stipulated to nearly all of the key facts. To that end, it is undisputed that Debtor failed to answer the mold question on the Sales Disclosure Form

truthfully. Further, the parties stipulated that Debtor had actual knowledge that her answer on the Sales Disclosure Form was false. Last, the parties stipulated that the Burches were damaged by the Debtor's conduct in excess of $200,000 that can be traced to Debtor's Ally Account 5313 as of the Petition Date. Therefore, the Court finds that the Burches have satisfied the elements for a fraud claim under the Indiana real estate disclosure statues. In addition, the Eighth Circuit has adopted the "lowest intermediated balance test" for tracing. In this case, the sum of $200,000 can be directly traced from the Net Sale Proceeds from the Real Property into Debtor's Ally Account 5313. Thus, the Court finds that the funds are sufficiently traceable.

Looking at the equities of the case, it is apparent that they are most favorable to the Burches. Here, the Burches suffered tremendous financial, mental and physical damages well beyond the $200,000 in dispute. The purchase of a home is one of the most important milestones in the pursuit of the American dream.  A home represents safety, protection, and a sound investment.  Since the purchase of the Real Property, the Burches and their family have not experienced those simple pleasures. Upon discovering the mold in the basement, the Burches had to evacuate from the Real Property and seek medical treatment for their minor children. Furthermore, the children have experienced traumatic emotional and psychological effects of having to constantly move from temporary home to temporary home.  Financially, the Burches purchased the Real Property for the full market value of $320,000 and are still paying the mortgage on a home that they may never be able to occupy.  Debtor was able to receive the proceeds of the sale of the Real Property and ultimately benefit from her fraud.

The Court also weighs the detriment of imposing a constructive trust on Debtor's remaining creditors. The Court acknowledges that imposing a constructive trust would take $200,000 from the estate causing a smaller pool of funds to pay creditor claims. Moreover, the Court acknowledges that the Burches could file a Proof of Claim and receive a distribution in the same manner as the other creditors. However, as the parties stipulated, Debtor's Schedules list

eleven unsecured creditors and of those nine are credit card companies that extended credit to Debtor or her sole proprietorship business.  Other than the Burches' claim, the claims of all the other creditors listed in Debtor's Schedules arose after the funds in Debtor's Ally Account 5313 were frozen.  Thus, it is clear that the Burches' claim is not similarly situated to Debtor's other creditors.  The Court is aware that the equities of bankruptcy are not the equities of common law; however, such egregious, fraudulent, and deceptive misconduct by Debtor can only lead to one conclusion, imposing a constructive trust.

Therefore, by separate order a constructive trust will be imposed as to $200,000 in Debtor's Ally Bank Account 5313.  In light of the ruling imposing the constructive trust, the relief requested in Trustee's compliant will be denied as moot.

*Kathy A. Surratt-States*

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED:  January 6, 2017
St. Louis, Missouri

-16-

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO 63102

Shulyn X. Zhang
13015 Geranium Ct
St Louis, MO 63146

Edward J. Karfeld
680 Craig Road
Suite 306
St. Louis, MO 63141-7182

David A. Warfield
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101

Rochelle D. Stanton
745 Old Frontenac Square
Suite 202
Frontenac, MO 63131

Fredrich J. Cruse
The Cruse Law Firm PC
PO Box 914
Hannibal, MO 63401

Jacob and Stephanie Burch
4 North Village Dr
Carmel, IN 46032